BRUNSWICK (NICHOLS v.). See Cases Nos. 10,238 and 10,239.

BRUNSWICK (GURNEE v.). See Case No. 5,872.

BRUNTON (COFFEEN v.). See Cases Nos. 2,946 and 2,947.

## Case No. 2,058.

BRUSH et al. v. The PLAINFIELD.

[2 N. J. Law J. 331.]

District Court, D. New Jersey. Sept. 10, 1879.

COLLISION—CONTRIBUTORY NEGLIGENCE.

1. Vessels have a right to anchor in crowded harbors; but if they remain there in a dense fog they must exercise the most constant vigilance and activity to make known their position, and if they fail to do this they cannot expect full reparation for damages. Bells must be rung at shorter intervals than two minutes.

2. A ferry boat having run into a schooner at anchor in New York bay, and both vessels

having been found to be at fault, the damages were equally apportioned, and no costs were awarded to either party.

3. A cross libel was filed by the ferry boat against the schooner for injuries done by the ferry boat to another schooner in consequence of the collision and which were paid for by the ferry boat. This libel was dismissed because the libellants were themselves also in fault.

In admiralty. Libel in rem. [Dismissed.]

Cornelius S. See, for libellant.

Wm. A. Lewis, for respondent.

NIXON, District Judge. This is a bill for a collision filed by the owners of the schooner Belle R. Hull, against the ferry boat Plainfield. On the morning of June 4th, 1878, at about 4½ o'clock the said ferry boat left her slip at the pier at the foot of Liberty street in the city of New York, for her usual landing place at the pier of the New Jersey Central Railroad Company in Jersey City, and while crossing the river collided with the Belle R. Hull, which was lying at anchor in the North or Hudson river, about five hundred yards from the New Jersey shore. Although it was after sunrise when the collision occurred, the morning was very foggy, and vessels in the river were not visible at a short distance from each other. The answer admits the collision, but claims that the ferry boat was not in fault. It alleges that owing to the fog much care and caution were exercised on her part in the navigation of the river, by constantly blowing her whistle and putting on extra lookouts, whilst on the other hand, great negligence was apparent in the management of the schooner, she being anchored near or in the course and track of the ferry boat, keeping no sufficient lookout, ringing no bell, and sounding no horn. The testimony is in direct conflict, and the whole difficulty in the case arises from not knowing where the truth lies between the parties. I have examined the evidence with great care, in regard to two questions, because it seems to me that the case largely turns upon the manner in which they are decided. 1. Whether the ferry boat was out of her proper course when the collision occurred. 2. Whether the schooner took those necessary precautions to make known her position which were demanded from her being anchored in a public thoroughfare.

1. It is difficult to ascertain the precise location of the libellant's schooner, the witnesses varying from one quarter to three quarters of a mile above the Communipaw ferry. She occupied a position on the flats which she had taken the previous day—some distance north of the usual ferry track. It is important to observe that when she cast anchor there, a number of other vessels were anchored in the neighborhood—one at least to the south and east—the schooner Maderia, which had been lying there since the preceding Saturday. If the libellant's schooner was in the track of the ferry, the Maderia was still more so, and had been for several days, and yet there is no intimation that either of these vessels was warned by any one connected with the ferry company, although passing and repassing them at all times during every hour of the day and night that they were occupying a dangerous position. I am inclined from this fact to give more credence to the testimony of those who assert that the Belle R. Hull was entirely above and out of the usual track of the ferry boats than to those who assert the contrary, and to assume that the collision was primarily caused by the ferry boat being out of her usual and proper course. This view is strengthened by the evidence of Barker, the pilot of the respondent's boat, and by an affidavit which he made before one of the United States local inspectors of steam vessels, on the day after the accident, detailing the cause of the disaster. (After quoting the testimony at some length, THE COURT proceeds:) I think it is quite evident that if this mistake had not been made, and if, instead of attempting to pass to the stern of the Belle R. Hull, under the impression that she was the schooner farthest south, the pilot had ordered the engineer to reverse his engine and back, as soon as he saw the vessel, the collision would not have occurred, or at least its damaging effects would have been averted.

2. But was the libellant's vessel entirely free from fault? Did she take all proper precaution to advise the ferry boat of her location in the midst of the fog? In this matter the law is exacting. Vessels undoubtedly have a right to anchor in crowded harbors, but they cannot be allowed to remain there in a dense fog without exercising the most constant vigilance and activity to make known their position, and where there is any failure in this respect, and a collision takes place, they must not look to the court for full reparation for their injuries. (After stating the evidence of the crew of the schooner, THE COURT proceeds:) In the midst of so much uncertainty, it is quite probable that a longer interval of two or three minutes elapsed between the periods of ringing the bell. Whether this be so or not, that does not show sufficient diligence. In a heavy fog, when ferry boats are passing at all times, an anchored vessel should announce her location more frequently than once in two or three minutes, either by fog horn or bell, and a failure to do so must be regarded as negligence. Besides, what kind of a bell was rung? The captain says that it was a regular fog bell, and that he was told that it was the regulation size. But not a single witness has been produced from the crew or passengers of the Plainfield, or from the crew of the Maderia, or any other vessel in the neighborhood, who testifies that he heard any bell on the Belle R. Hull, although several have said that if any bell had been

rung, they are sure that they would have heard it. From all these circumstances I am compelled to infer that either there was a longer interval than the witnesses remember before the collision when the bell was not rung, or it was so rung that the parties most interested in the location of the vessel were not able to hear it. The evidence of Jones in regard to what took place after the accident is suggestive. He says: "All the crew staid on watch after the collision. I rang the bell. I was determined they should know next time where we were." Does not this imply that the bell was so rung by the witness before the collision that he himself was in doubt whether the ferry boat knew where they were? As both vessels were in fault, the case falls within the principle of The Bedford [Case No. 1,216]; The Baltic [Id. 822]; and The Lydia [Id. 8,614]; in each of which there was a decree equally apportioning the damages caused to the libellant's vessel by the collision. No costs will be awarded to either party, and there is no need of a reference, as the testimony taken seems to have regard as well to the damages sustained as to the liability. The libellant paid out $180.14 in cash for repairing, as the immediate consequence of the injury, and seems to have been detained several days from the prosecution of his ordinary business with his vessel. The damages for the detention are somewhat speculative as to loss of freights which were never earned, but the wages accruing to the crew, and their support, are tangible, and should be considered. I think that three hundred dollars is a fair estimate of the libellant's damages from the evidence, and a decree will be entered against the defendant for half of that sum, to wit, one hundred and fifty dollars.

The testimony in this cause largely refers to another suit growing out of the foregoing. After the ferry boat Plainfield had collided with the Belle R. Hull, in which the former received no injury, she drifted with the tide into another schooner, the Maderia, anchored a short distance to the south and east of the Belle R. Hull, carrying away the jibboom, and at the same time receiving damages to the hood of the ladies' cabin, to the amount exceeding one hundred dollars. No claim was put in for damages against the Maderia by the owners of the ferry boat, although she was anchored more nearly in the ferry track of the Plainfield than the Belle R. Hull; but, on the other hand, the captain of the Maderia was paid for the loss of the jibboom. As soon as the libel was filed in this case, the defendants and claimants filed a cross libel in rem against the Belle R. Hull for these consequential injuries. Such suits are doubtless maintainable in cases where the libellants are in no fault themselves (see Ward v. The Ogdensburgh [Case No. 17,158]), but where, as in this case, it appears that they contributed largely in the original collision, they are not entitled to recover, and the cross libel must be dismissed with costs.